IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARINOR ASSOCIATES, INC.,            §
                                     §
        Plaintiff,                   §
                                     §
v.                                   §    CIVIL ACTION NO. H-08-1868
                                     §
M/V PANAMA EXPRESS, her engines,§
boilers, etc. *in rem*, PRIMERA      §
MARITIME (HELLAS) LTD., SLADE        §
SHIPPING, INC., FOREIGN TRADE        §
EXPORT PACKING CO. INC.,             §
RICKMERS-LINIE GMBH CIE KG,          §
and RICKMERS-LINIE (AMERICA),        §
INC., *in personam*,                 §
                                     §
        Defendants.                  §

MEMORANDUM AND ORDER

Pending are Defendant Primera Maritime (Hellas) Ltd.'s Motion for Partial Summary Judgment (Document Nos. 62-66), and Defendant Rickmers-Linie GmbH & Cie KG's Motion for Partial Summary Judgment and Rickmers-Linie (America), Inc.'s Motion for Summary Judgment and Partial Summary Judgment (Document No. 73).  After carefully considering the motions, responses and the applicable law, the Court concludes as follows.

I.   Background

This is a maritime cargo loss case arising from the on-deck ocean carriage of thirty-three dressed riser joints aboard the M/V

Panama Express.[1]  While the M/V Panama Express was transiting the Yucatan Channel toward the Panama Canal, eight of the thirty-three risers were lost overboard and the remaining twenty-five risers suffered physical damage.

Plaintiff Marinor Associates, Inc. ("Marinor") sold the riser joints and other subsea drilling equipment to Samsung Heavy Industries.[2]  Under Marinor's sales agreement with Samsung, Marinor was required to deliver the equipment to Samsung in South Korea.[3]  Marinor engaged Defendant Foreign Trade Export Packing Co., Inc. ("FTEP"), a freight forwarder, to arrange for the shipment from Houston, Texas to Pusan, South Korea.[4]  Upon Marinor's request, FTEP provided quotes for the ocean carriage of the drilling equipment, including the dressed risers.[5]  After receiving the quotes, Marinor directed FTEP to proceed with the transportation of the risers and other equipment aboard vessels chartered by Defendant Rickmers-Linie GmbH & Cie KG ("Rickmers GmbH").

---

[1] A riser joint is an 80-foot long piece of pipe that has five auxiliary lines welded to its outside.  Document No. 62, ex. 1 at 22 (Boyle Depo.).  Twelve pieces of buoyancy are fitted to each riser.  Id.  A riser joint that has buoyancy modules affixed to it is referred to as a "dressed" riser joint and a riser joint that does not have buoyancy modules affixed to it is referred to as a "slick" riser joint.  Id., ex. 2 at 22 (Yates Depo.).

[2] Id., ex. 1 at 22, 30 (Boyle Depo.).

[3] Id., ex. 1 at 31 (Boyle Depo.).

[4] Id., ex. 1 at 33 (Boyle Depo.).

[5] Id., ex. 1 at 38-39 (Boyle Depo.).

FTEP, acting as Marinor's freight forwarder, contracted with Defendant Slade Shipping, Inc. ("Slade") to act as the non-vessel operating common carrier, or NVOCC.[6]  Slade and FTEP then engaged Rickmers GmbH, through its local agent Defendant Rickmers-Linie (America), Inc. ("Rickmers America"), as the carrier to transport the equipment.  Through FTEP and Slade, Marinor entered into an agreement with Rickmers GmbH to transport the risers in three shipments on the M/V Reina Rosa, M/V Panama Express, and M/V Millenium Falcon.  Slade and Rickmers GmbH entered into three Liner Booking Note contracts--one for each shipment.

The first and third shipments, aboard the M/V Reina Rosa and the M/V Millenium Falcon, respectively, successfully delivered their cargos, the first loaded on deck and stowed in a fore-aft manner,[7] and the latter stowed fore-aft below deck.[8]

---

[6]  Document No. 62, ex. 4 at 29 (Hatz Depo.).  An "NVOCC is defined as 'a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier.'"  AEL Asia Express (H.K.), Ltd. v. Am. Bankers Ins. Co., 5 F. App'x 106, 109 (4th Cir. 2001) (quoting 46 U.S.C.A. app. § 1702(17)) (emphasis in original). "Courts frequently describe NVOCCs as 'intermediaries between a shipper of goods and an operator of a vessel that carries the goods.'"  Id. (quoting Axess Int'l Ltd. v. Intercargo Ins. Co., 183 F.3d 935, 937 (9th Cir. 1999)).

[7]  Document No. 62, ex. 2 at 91 (Yates Depo.).

[8]  Document No. 79, ex. F (Sabine Surveyor's Report for M/V Millennium Falcon).

The second shipment, on the M/V Panama Express, carried Marinor's thirty-three risers on deck athwartships.[9]   Rickmers GmbH, or its agent Rickmers America, prepared the loading plan.[10] Port captains working for Rickmers GmbH and/or Rickmers America oversaw the loading.[11]   Rickmers's stevedores loaded the riser joints from June 1 through June 4, 2007.

During the loading, stowing, and lashing of the risers, Sabine Surveyors' representatives were onboard the M/V Panama Express.[12] During the loading, Sabine Surveyors' employee, Ralph Perera, became concerned with how the risers were being stowed.[13]   Perera told his concerns to his boss, who contacted FTEP.[14]   Perera also conveyed his concerns to the Master and Chief Officer, who were employees of Rickmers GmbH and/or Defendant Primera (Maritime) Hellas, Ltd. ("Primera").[15]   Primera was the vessel manager of the M/V Panama Express.

---

[9] Athwartships means "[a]cross a ship from side to side." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).

[10] Document No. 62, ex. 18 at 26 (Capt. Snov-Nissen Depo.).

[11] Id., ex. 12 at 23-24 (Kopic Depo.); id., ex. 16 at 55-57 (Capt. D'Souza Depo.); id., ex. 17 at 16-17, 48-49 (Capt. Nair Depo.).

[12] Document No. 62, ex. 14 (Sabine Surveyors Report).

[13] Id., ex. 15 at 28-30, 33-35 (Perera Depo.).

[14] Id.

[15] Id.

In addition, Daniel Goike, a Marinor employee, was present onboard during the loading of most of the risers and observed the risers being loaded, stowed, and lashed athwartships on deck.[16] Mr. Yates, who was Goike's boss, also personally observed that the risers were being loaded athwartships on the deck of the M/V Panama Express.[17]

Before departure, the vessel's Master and Chief Officer calculated the vessel's metacentric height and found that it was the highest ever recorded for the vessel.[18] The high metacentric height allegedly caused the vessel to be very stiff, meaning that "side-to-side rolling movement while [the vessel is] underway will become excessive, and very jerky and very quick."[19] The high metacentric height was due to a heavy load that was in the vessel's lower holds.[20] Nevertheless, the M/V Panama Express set sail on June 5, 2007. The next day, thirty-six hours after departure, the vessel began to roll excessively. Eight risers were lost overboard while the remaining twenty-five risers were damaged. The parties dispute whether the vessel began rolling because it encountered Tropical Storm Barry.

---

[16] Id., ex. 2 at 39-40 (Yates Depo.).

[17] Id.

[18] Document No. 79, ex. I at 59 (Capt. Hanily Depo.).

[19] Id., ex. I at 59-63 (Capt. Hanily Depo.).

[20] Id., ex. I at 61-62 (Capt. Hanily Depo.).

Marinor received two bills of lading: one from Rickmers GmbH and one from Slade. The parties' summary judgment arguments primarily concern whether these contracts limit Defendants' liability for the loss and damage to the riser joints.

## II. Summary Judgment Standard

Rule 56(a) provides that summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[21] Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct.

---

[21] As of December 1, 2010, Federal Rule of Civil Procedure 56 has been amended. As these motions were filed prior to that date, the previous version of Rule 56 is applied to these motions.

2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

### III. Primera's Motion for Partial Summary Judgment

### A. Is Primera's Liability Limited Under the Slade Bill of Lading?

Primera asserts that its liability is limited by the Slade Bill of Lading. Marinor, as the shipper, and Slade, as the NVOCC, were the parties to the Slade Bill of Lading. Primera asserts that the Slade Bill of Lading extends liability limitations to Primera as an intended third-party beneficiary. Marinor asserts that Primera is not an intended beneficiary of the Slade Bill of Lading because "Primera has not and cannot show that it accepted to be

bounded by the terms and conditions of the Slade bill of lading to make it a third-party beneficiary thereof."[22]

Marinor's argument confuses when a third party may acquire a *benefit* from a contract to which he is not a party with when he may be *subject to obligations* from such a contract. A third party beneficiary does not need to take specific action to acquire a contractual *right*. See, e.g., <u>Stein Hall & Co. v. S.S. Concordia Viking</u>, 494 F.2d 287, 291 (2d Cir. 1974) ("While the carrier and the shipper can extend certain contractual protections, such as the limitation on damages, to stevedores as third-party beneficiaries, they cannot contract to *bind* an unconsenting third party." (internal citation omitted) (emphasis added)). However, to become subject to the *obligations* of a contract, a third party must either accept to be bound to the contract or be bound through agency principles. See, e.g., <u>In re M/V Rickmers Genoa Litig.</u>, 622 F. Supp. 2d 56, 72 (S.D.N.Y. 2009) (finding that while consignee may have been a third-party beneficiary under bills of lading, it was not bound by the bills of lading because it was not a party to the bill and did not consent to be bound by its terms). Here, the issue is whether Primera is entitled to enforce the bill of lading's liability limitation provision (a contractual right) against Marinor, not whether Marinor can enforce contractual

---

[22] Document No. 79 at 8 (Marinor's Response to Primera's Motion for Partial Summary Judgment).

obligations against Primera.  Thus, the focus is on whether Marinor

and Slade agreed to extend the liability limitation to a party in

Primera's role.

The Slade Bill of Lading provides:

> 2. In the bill of lading, the word "Carrier" includes
> the ship owner, and any of its employees, agents or
> contractors (See Clause 6).  In the event that
> cargo subject to the bill of lading is transported
> aboard a vessel which is chartered, not owned, by
> the operator, the word "Carrier" shall include the
> operator-charterer of the ship and any of its
> employees, agents or contractors.  The words
> "underlying carrier" shall include any water, rail,
> motor, air or other carrier utilized by the
> Carrier, for any part of the transportation of the
> shipment.  The words "water carrier" shall include
> any ship, barge, lighter, her owner, master
> operator or charterer.  The word "vessel" shall
> include any substituted vessel, feedership, or
> other water craft.  The word "Merchant" includes
> the Shipper, the Consignee, the Holder of the bill
> of lading and the Owner of the goods.  The words
> "On Board" means onboard any mode of transportation
> used by the carrier.
>
> . . .
>
> 10. Package Limitation.  Where container(s) is stuffed
> by shipper or on his behalf, Carrier's liability
> will be limited to $500 with respect to the
> contents of each container, except when the shipper
> declares Ad Valorem valuation on the face hereof
> and pays additional freight on such declared
> valuation.  The freight rate charged where no
> higher valuation is declared by the Shipper is
> based on a valuation of $500 per container.  Where
> the goods in such a container belong to more than
> one owner, the $500 will be apportioned according
> to each owner's interest in the contents.  Where
> goods are received by the Carrier breakbulk, the
> Carrier's liability shall be limited to $500 per
> carton, skid, pallet, or other unit, except when

9

> the Shipper declares Ad Valorem value herein and
> pays additional freight as above.[23]

The Slade Bill of Lading further provides that "goods" include
"[d]eck cargo" as long as it is not carried in containers on deck.[24]

Primera asserts that it is a "Carrier" under the Slade Bill of
Lading because Clause 2 provides that agents of the ship owner are
"Carriers" and Primera is an agent of M/V Panama Express's owner--
Fleet Holdings Corporation.[25] Parties to a bill of lading may
contractually extend liability limitations to third parties.
Norfolk S. Ry. Co. v. Kirby, 125 S. Ct. 385, 397 (2004). Clauses
that extend this protection are commonly called Himalaya clauses.
Id. Neither traditional privity of contract nor a traditional
agency relationship is required to limit a third party's liability
through a bill of lading. Id. Rather, bills of lading "must be
construed like any other contracts: by their terms and consistent
with the intent of the parties. . . . [T]here is no special rule
for Himalaya Clauses." Id.

In Kirby, the cargo owner hired ICC to arrange for the
shipping of machinery from Australia to Alabama. Id. at 390. ICC
issued Kirby a bill of lading containing the COGSA default

---

[23] Document No. 62, ex. 13 [hereinafter "Slade Bill of
Lading"].

[24] Slade Bill of Lading Clause 19.

[25] Document No. 62, ex. 7 (Koronis Decl.).

10

liability limitation of $500 per package for ICC and the other

parties who would participate in transporting the machinery.  <u>Id.</u>

at 396.  The bill's Himalaya clause provided:

> These conditions [for limitations on liability] apply
> whenever claims relating to the performance of the
> contract evidenced by this [bill of lading] are made
> against *any servant, agent or other person (including any
> independent contractor) whose services have been used in
> order to perform the contract*.

<u>Id.</u> (emphasis added in <u>Kirby</u>).  The Court held that the defendant

that was hired to carry the cargo overland via train was entitled

to take advantage of liability limitations in the ICC bill of

lading.  <u>Id.</u> at 396-98.  The Supreme Court interpreted the bill of

lading as follows:

> The plain language of the Himalaya Clause indicates an
> intent to extend the liability limitation broadly--to
> "*any* servant, agent or other person (including any
> independent contractor)" whose services contribute to
> performing the contract. . . . "Read naturally, the word
> 'any' has an expansive meaning, that is, 'one or some
> indiscriminately of whatever kind.'"  *United States v.
> Gonzales*, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132
> (1997) (quoting Webster's Third New International
> Dictionary 97 (1976)).  There is no reason to contravene
> the clause's obvious meaning.

<u>Id.</u> at 397 (emphasis in original).

Here, the second clause of the Slade Bill of Lading provides

that "the word 'Carrier' includes the ship owner, and *any* of its

11

employees, agents or contractors."[26]   The Bill provides that the "vessel," or ship, is the "PANAMA EXPRESS."   Fleet Holdings Corporation is the owner of the M/V PANAMA EXPRESS.[27]   The uncontroverted evidence establishes that Primera was Fleet Holdings's agent when managing the vessel.   The Ship Management Agreement between Fleet Holdings and Primera provides:

> 2.3   Subject to the terms and conditions herein provided, during the period of this Agreement, the Managers [i.e., Primera] shall carry out, as agents for and on behalf of the Owners [i.e., Fleet Holdings], such of the following functions in respect of the Vessel . . .: Crewing . . . Technical Management . . . Insurance . . . Freight Management . . . Accounting . . . Chartering . . . Sale or purchase of Vessel . . . Provisions . . . Operation.[28]

The definition of the term "Carrier" in the Slade Bill of Lading therefore encompasses Primera, which was the agent of the ship's owner.   As a "Carrier" under the Slade Bill of Lading, Primera's "liability shall be limited to $500 per carton, skid, pallet or other unit" where "goods," which includes cargo carried on deck, "are received by the Carrier breakbulk."[29]

---

[26] Slade Bill of Lading Clause 2 (emphasis added).

[27] See Document No. 62, ex. 7 (Koronis Decl.).

[28] Id., ex. 7 at Primera0002.

[29] The "Package Limitation" clause further provides that the $500 liability limitation for breakbulk cargo does not apply when "the Shipper declares Ad Valorem value herein and pays additional freight as above."   Slade Bill of Lading Clause 10.   There is no

The Slade Bill of Lading also incorporates COGSA's liability limitations.  Clause 7 of the Slade Bill of Lading, entitled "Carrier's Liability" provides that water transportation:

> [S]hall be subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, or to any similar Hague Rules law compulsorily to [sic] this bill of lading, which Act or law shall be deemed to be incorporated herein.  The provisions of said Act of law (except as otherwise specifically provided herein) shall also govern before the shipment is loaded on and after it is discharged from the vessel while the shipment is in the custody and possession of the Carrier.[30]

Clause 19 specifically addresses deck cargo, specifying that on-deck shipments "shall be deemed goods, and shall be subject to all terms and provisions in this bill of lading relating to goods."[31]

Read together, Clauses 7 and 19 provide that COGSA applies to the bill of lading as a contract term.  Although COGSA does not apply of its own force to "goods" that are "stated as being carried on deck and [are] so carried," COGSA § 1(c),[32] parties can

_____

evidence Marinor or its agents paid additional freight to raise the default liability limitation.

[30] Slade Bill of Lading Clause 7(b).  COGSA is modeled after the Hague Rules. Robert C. Herd & Co. v. Krawill Mach. Corp., 79 S. Ct. 766, 769 (1959).

[31] Slade Bill of Lading Clause 19.

[32] 49 Stat. 1207 (1936), *reprinted in* note following 46 U.S.C. § 30701.  COGSA was previously codified in the appendix to Title 46 of the United States Code.  When Title 46 was recodified in 2006 by

13

incorporate COGSA's provisions to apply contractually to on-deck cargo. *See* Gen. Elec. Co. v. Inter-Ocean Shipping, 862 F. Supp. 166, 168 (S.D. Tex. 1994) (finding that similar clauses incorporated COGSA into the bills of lading); *see also* Foster Wheeler Energy Corp. v. An Ning Jiang MV, 383 F.3d 349, 356 (5th Cir. 2004) (stating that when COGSA is "'adopted by and in a contract,' COGSA's provisions are merely contract terms that are 'modifiable by other language contained in the bill of lading.'" (quoting Hartford Fire Ins. Co. v. Orient Overseas Containers Lines, 230 F.3d 549, 558 (2d Cir. 2000))); 2A BENEDICT ON ADMIRALTY ch. 5 § 43 (2009). COGSA contains a $500 liability limitation per "Package" or per "Customary Freight Unit." Thus, both Clause 10 ("Package Limitation") and Clause 7 ("Carrier's Liability") of the Slade Bill of Lading serve to limit Primera's liability as a "Carrier."

The parties next dispute whether either of these clauses limits Primera's liability to $500 per riser, which depends upon whether the riser joints are "packages" under COGSA (Clause 7) or "units" under Clause 10. The summary judgment evidence includes

---

Pub.L. 109-304, Oct. 6, 2006, 120 Stat. 1485, COGSA was not included except as a statutory note to the first section of the Harter Act, 46 U.S.C. § 30701. *See* David W. Robertson & Michael F. Sturley, *Recent Developments in Admiralty and Maritime Law at the National Level and in the Fifth and Eleventh Circuits*, 32 TUL. MAR. L.J. 493, 500 (2008) (explaining the codification issues). COGSA was not repealed by the recodification. *See, e.g.*, Ambraco, Inc. v. Bossclip B.V., 570 F.3d 233, 237 (5th Cir. 2009) (applying COGSA).

proof similar to the summary judgment evidence presented in <u>Tamini</u> <u>v. M/V Jewon</u>, 699 F. Supp. 105 (S.D. Tex. 1988), *aff'd sub nom.* <u>Tamini v. Salen Dry Cargo AB</u>, 866 F.2d 741 (5th Cir. 1989).  On appeal, the Fifth Circuit held that the amount of liability "turns on the factual determination that a certain piece of cargo is or is not a 'package'" under COGSA.  <u>Tamini</u>, 866 F.2d at 742.  Likewise, the inconsistent evidence here precludes summary judgment on whether the risers are "packages," which is a question of fact to be resolved at trial.

Primera's alternate argument is that the risers are "other units" within the meaning of Clause 10.  The term "unit" is not defined in the bill of lading.  On the one hand, the phrase "other unit" could broadly encompass any piece that is shipped individually, which would include individual risers.[33]  On the other hand, the phrase could be limited to other *packaged* units, which may or may not include the risers because, as discussed, the risers may not be "packaged."  Indeed, Clause 10 is defined as the "*Package* Limitation," and provides two circumstances in which

---

[33] *See* <u>Studebaker Dist. Ltd. v. Charlton S.S. Co. Ltd.</u>, 1 K.B. 459, 466 (1938) (holding that clause that limited liability to "packages" did not cover motor cars that were shipped unpacked because "'Package' must indicate something packed. . . . [F]or instance, on a shipment of grain it could apply to grain shipped in sacks, but could not, in my opinion, possibly apply to a shipment in bulk. If the shipowners desire that it should refer to any individual piece of cargo, it would not be difficult to use appropriate words, as, for instance, 'package or unit.'").

liability is limited.[34]  First, if goods are packed in containers,
then liability is limited to $500 per container.  Second, the
paragraph limits liability if goods are received "breakbulk."
"Breakbulk" is defined as "[h]aving, been, or related to shipments
of goods packed in small, separable units."   AMERICAN HERITAGE
DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).  Moreover, the phrase
"other unit" appears on a list with "carton, skid, [and] pallet,"
which are all types of packaging.  Thus, the "other unit" arguably
may be interpreted to mean "other unit of packaging."

Thus, whether the risers were shipped in COGSA "packages" or
"other units," or whether the appropriate limitation of liability
will be $500 per "customary freight unit," has not been established
as a matter of law in the summary judgment evidence.[35]

B.   Was There an Unreasonable Deviation from the Slade Bill of
     Lading by Shipping the Riser Joints On-Deck Athwartships?

     (1)   The Unreasonable Deviation Doctrine and Liability
           Limitations

Limitations of liability in bills of lading are defeated by
unreasonable deviations from the terms of the bill of lading,

---

[34] Slade Bill of Lading Clause 10 (emphasis added).

[35] "It is settled that the phrase 'customary freight unit'
means the unit by which the freight was calculated in the
particular case."  1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 724
& n. 2.  Primera asserts that the freight charges for the risers
were calculated based on a volumetric measurement of 1570.425 cubic
meters.  Document No. 93 at 3.

"because such a deviation is a fundamental breach of the contract." English Elec. Valve Co., Ltd. v. M/V Hoegh Mallard, 814 F.2d 84, 89 (2d Cir. 1987); C.A. Articulos Nacionales de Goma Gomaven v. M/V Aragua, 756 F.2d 1156, 1159 (5th Cir. 1985) ("[T]his circuit has consistently held that an unreasonable deviation, whether geographic or otherwise, still operates to deprive the carrier of any limitation of liability in the contract of carriage, including COGSA's $500 per package limitation."). "The doctrine of deviation has been a part of the maritime law since long before the enactment of COGSA in 1936." M/V Aragua, 756 F.2d at 1157. The doctrine arose in response to deviation clauses in maritime insurance contracts, under which cargo lost its insurance if the carrier unreasonably deviated from the voyage described in the bill of lading. Rockwell Int'l Corp. v. M/V Incotrans Spirit, 707 F. Supp. 272, 273 (S.D. Tex. 1989) (Lake, J.). To avoid this harsh result, courts held that the carrier, whose conduct voided the shipper's cargo insurance, itself became liable as an insurer for damage suffered to the cargo during or after the deviation. Id. (citing The Willdomino v. Citro Chem. Co. of Am., 47 S. Ct. 261 (1927)). The doctrine of deviation typically applies to a "geographic" deviation, which refers to "'a voluntary departure, without necessity or reasonable cause, from the regular and usual course' of a voyage." M/V Aragua, 756 F.2d at 1157-58 (quoting Hostetter v. Park, 11 S. Ct. 1, 4 (1890)). A vessel making a geographic

deviation is considered to be on an entirely different voyage from the one contemplated.  Id. at 1158.

Over time the doctrine was broadened to include unauthorized deck carriage as a "quasi" deviation.  2A BENEDICT ON ADMIRALTY § 123 at 12-13 (7th ed. 2010).  Regardless of the type of deviation (geographic or "quasi"), "[b]y its name and origin a 'deviation' means a departure from the terms of the bill of lading." Rockwell Int'l, 707 F. Supp. at 273.  Mere negligence or gross negligence in the performance of the carrier's duties does not constitute a deviation. See, e.g., id.; Sedco, Inc. v. S.S. Strathewe, 800 F.2d 27, 32 (2d Cir. 1986) ("M]ere negligence, lack of due diligence, or a failure to properly handle, stow, care, or deliver cargo, never has constituted deviation."); Cera-Tech, S.A. v. Allison Lykes, No. 90-2093, 1991 WL 94178, at *10 (E.D. La. May 30, 1991) ("It is established beyond dispute that negligence in the performance of such duties, and even gross negligence and wanton and willful misconduct, although they may impose liability upon the carrier, do not constitute deviations, with the effect of voiding either a contractual or statutory limitation of liability.").

(2)  Unauthorized On-Deck Carriage

It is undisputed that the Slade Bill of Lading is "clean" because it does not specify that the risers would be stowed on

deck.[36]   Primera asserts, however, that there was no deviation because Marinor had actual notice of the on-deck stowage, and "[a]ctual knowledge of on-deck stowage by the shipper is all that is required."[37]   It is undisputed that Marinor had knowledge that its risers were being loaded on the deck of the M/V Panama Express athwartships.  Nonetheless, Marinor insists that its *consent* to on-deck carriage, not mere knowledge, is required, and that absent such consent, on-deck carriage may constitute an unreasonable deviation from a clean bill of lading.[38]

Absent a "*definite agreement* one way or the other, a shipper is entitled to expect below deck storage" unless there is a port custom to the contrary.  Blasser Bros. v. N. Pan-Am. Line, 628 F.2d

---

[36] *See* Document No. 62 at 15 (Primera's Motion for Partial Summary Judgment) ("The Slade Bill of Lading is a 'clean' bill of lading, as it does not note on its face that the risers were to be carried on deck."); Document No. 79 at 19 (Marinor's Response to Primera's Motion for Partial Summary Judgment) ("It is undisputed that the Slade bill of lading is a 'clean' bill of lading . . . .").

A shipper may presume that a clean bill of lading will result in carriage of the cargo below deck unless there is (1) agreement to the contrary, or (2) a port custom permitting on-deck stowage. Constructores Tecnicos, S. de R.L. v. Sea-Land Serv., Inc., 945 F.2d 841, 845 (5th Cir. 1991), *overruled on other grounds by* McDermott, Inc. v. AmClyde, 114 S. Ct. 1461 (1994).  "It is the carrier's burden to overcome the presumption by introducing appropriate evidence of agreement or port custom." Id. (citing Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 299 (2d Cir. 1987)).

[37] Document No. 82 at 9.

[38] Document No. 79 at 14-15.

376, 384 n.13 (5th Cir. 1980) (emphasis added); *see also* <u>St. John's</u>
<u>N.F. Shipping Corp. v. S.A. Companhia Geral Commercial do Rio de</u>
<u>Janeiro</u>, 44 S. Ct. 30, 31 (1923) (holding that absent a port custom
or an "*express contract* in a form available as evidence, a clean
bill of lading imports under deck stowage," and holding that the
shipper had not "assented to stowage on deck" when the carrier
issued a clean bill of lading (emphasis added)); <u>Konica Bus. Machs.</u>
<u>v. Vessel Sea-Land Consumer</u>, 47 F.3d 314, 315 (9th Cir. 1995)
(labeling port custom and express contract the "two exceptions to
the general rule of unreasonable deviation" set out in <u>St. John's</u>);
<u>Ingersoll Milling Mach. Co. v. M/V Bodena</u>, 829 F.2d 293, 299 (2d
Cir. 1987) (noting that, "[a]bsent *an express agreement* by the
shipper permitting cargo to be stowed on deck or a general port
custom permitting on deck stowage, a shipper is entitled to expect
below deck stowage under a clean bill of lading," and affirming
district court holding that the carrier "failed to meet its burden
of proof that [the shipper] *agreed* to on deck stowage" (emphasis
added)).

The question presented, therefore, is whether Marinor, which
admittedly had knowledge that its risers were being stowed on deck,
also *consented* to the on-deck stowage.  The summary judgment
evidence, including the actions and interactions of Marinor's
marine surveyor with the vessel's Master and Chief Officer,
Marinor's freight forwarder's (FTEP's) email communication to

Rickmers, and the like, must at this stage of the proceedings all be viewed in a light most favorable to Marinor.   Moreover, the summary judgment evidence here, and conflicting inferences that may be drawn, make this case different from General Electric Co. v. Inter-Ocean Shipping[39] and American Home Assurance Co. v. M/V Tabuk,[40] on which Primera relies.   In those cases there was no evidence that the shipper demurred or objected to on-deck stowage of which it had notice.   See Am. Home Assur. Co., 45 F. App'x at 14 (noting that the bill of lading "expressly permitted the carrier at his option to carry the cargo on-deck," and that the shipper's agent "booked the [cargo] for either under- or on-deck stowage"); Gen. Elec., 862 F. Supp. at 168 ("All of the parties in this voyage knew that on-deck storage was the only kind the Diana offered.").

Accordingly, genuine issues of material fact on (1) whether Marinor's risers were "packages," "other units," or "other freight units"; and (2) whether Marinor consented to on-deck stowage of the riser joints, preclude summary judgment for Primera.[41]

---

[39] 862 F. Supp. 166 (S.D. Tex. 1994) (Hughes, J.).

[40] 45 F. App'x 12 (2d Cir. 2002).

[41] Primera filed a response, Document No. 120, to Marinor's Supplemental Memorandum, Document No. 118, in which it argues for the first time that Rickmers is solely responsible for the loss to the cargo under a charter party agreement.   Although styled as a response to Marinor, this is in substance a motion for summary judgment based on an entirely new theory, filed more than eight months after the deadline for the filing of dispositive motions.   As Marinor and Rickmers have not yet responded, Primera's new contention is not considered.   See McDaniel v. Miss. Baptist Med.

IV.  Rickmers GmbH's Motion for Partial Summary Judgment and
     Rickmers America's Motion for Summary Judgment

     Rickmers GmbH moves for partial summary judgment that its
liability is limited by its bill of lading, which it asserts
incorporates the Hague Rules.  Rickmers America moves for summary
judgment that it is not liable to Marinor because Rickmers America
is an agent for a disclosed principal.  Marinor disputes both of
these points, and also asserts that "Rickmers" cannot limit its
liability because (1) Rickmers did not give Marinor a fair
opportunity to opt for a higher liability limitation, and
(2) Rickmers unreasonably deviated from its bill of lading.

A.   Limitation of Liability

     Rickmers GmbH asserts that the Hague Rules limit its liability
because they are incorporated into its bill of lading ("the
Rickmers GmbH Bill of Lading").[42]   Although Marinor initially
responded to Rickmers GmbH's Partial Motion for Summary Judgment
that German Law applied because of the bill of lading's German
choice-of-law clause, in its Sur-Reply, Marinor now argues that

---

Ctr., 869 F. Supp. 445, 453 (S.D. Miss. 1994) ("In the interest of
fairness, Defendant should not be allowed to raise new grounds for
the first time in its rebuttal to which Plaintiff will not have the
opportunity to provide an adequate response.").

     [42] Document No. 73, ex. 10-F [hereinafter "Rickmers GmbH Bill
of Lading"].

COGSA governs by its own force, or contractually by being incorporated in the Rickmers GmbH Bill of Lading.[43]

(1)   Does COGSA Govern by Its Own Force?

COGSA applies to contracts of carriage by sea "to or from the United States, in foreign trade," in which "goods" are shipped. COGSA, 49 Stat. 1207 (1936). Excluded from COGSA's definition of "goods," however, is "cargo which by the *contract of carriage is stated as being carried on deck and is so carried.*"  COGSA § 1(c) (emphasis added).  Here, an attachment to the Rickmers GmbH Bill of Lading provides: "Carried on deck without liability for loss or damage howsoever caused."[44]  Thus, because the risers were "stated as being carried on deck," which they were, they were not "goods" within the COGSA definition, and COGSA therefore does not apply of its own force.  *See Chester v. Maritima del Litoral S.A.*, 586 F. Supp. 192, 194-95 (D.C. Wis. 1983) (stating that COGSA did not apply because the vessel could carry goods only on deck, and the bill of lading provided that "neither the carrier nor the ship shall be liable for any loss or damage whatsoever however caused to goods which are hereby stated as being carried on deck and which are so carried").

---

[43] Document No. 96.

[44] Rickmers GmbH Bill of Lading at RICKMERS_000103.

Marinor asserts that COGSA applies because the phrase, "Carried on deck without liability for loss or damage howsoever caused," is invalid under COGSA.  The threshold question, however, is whether COGSA applies, and it does not because the risers are not "goods."  Only if COGSA applied would the Court turn to whether the Act invalidated provisions of the bill of lading.  Because COGSA does not apply of its own force, the Rickmers GmbH Bill of Lading must next be examined to determine if it adopts by its terms the liability limitations of COGSA or some other legislative scheme.

(2)   <u>Terms and Conditions of the Rickmers GmbH Bill of Lading</u>

Page one of the Rickmers GmbH Bill of Lading, entitled "Terms and Conditions," provides the following definitions:

**"Carrier"** means Rickmers-Linie GmbH & Cie KG, Hamburg.

. . .

**"Hague Rules"** means the provisions of the International Convention for the Unification of Certain Rules relating to Bills of Lading, signed at Brussels on 25th August, 1924 without amendments by the Protocol signed at Brussels on 23rd February, 1968.

. . .

**"Merchant"** includes the Shipper, Holder, Consignee, Receiver of the Goods or of this Bill of Lading, any Person owning or entitled to the possession of the Goods

24

or this Bill of Lading und [sic] anyone acting on behalf
of any such person.[45]

The bill of lading contains a Germany choice-of-law clause:

### 25. Law and Jurisdiction

Except as otherwise provided specifically herein any
claim or dispute arising under this Bill of Lading shall
be governed by the law of the Federal Republic of Germany
and determined in the Hamburg courts to the exclusion of
the jurisdiction of the courts of any other place.  In
case the Carrier intends to sue the Merchant the Carrier
has also the option to file a suit at the Merchant's
place of business.  In the event this clause
is inapplicable under local law then jurisdiction and choice
of law shall lie in either the Port of Loading or Port of
Discharge at Carrier's option.[46]

Under this provision, German law applies to "any claim or dispute
arising under this Bill of Lading," unless the bill of lading
"specifically" provides otherwise.  *See* APL Co. Pte. Ltd. v. UK
Aerosols Ltd., 582 F.3d 947, 957-58 (9th Cir. 2009) (stating that
courts give effect to the parties' contractual choice of law, and
finding that Singapore law applied because the parties specified
that Singapore law would govern issues not otherwise covered by the
bill of lading).

Clause 7 specifically provides when German law will not apply.
In particular, Clause 7(2) provides that COGSA, and not German law,
will apply when suits are brought in a United States court:

---

[45] Rickmers GmbH Bill of Lading Clause 1.

[46] Id. Clause 25.

25

**7. Sundry Liability Provisions**

**(1) Hague Rules/Hague-Visby Rules Limitation**

In the event that suit is brought in a court other than the court as provided for in Clause 25 and such court contrary to Clause 25 accepts jurisdiction, than [sic] the Hague Visby Rules are compulsorily applicable[;] if this Bill of Lading has been issued in a country where the Hague Visby Rules are compulsorily applicable and Carrier's liability shall not exceed 2 SDRS per kilo of gross weight of the Goods lost or damaged; if this Bill of Lading has been issued in a country in which the Hague Rules apply the Carrier's Liability shall not exceed GBP 100 per package or unit.

**(2) U.S. Carriage of Goods by Sea Act [L]imitation**

Notwithstanding any of the foregoing to the contrary, in the event that suit is brought in a court in the United States of America and such court, contrary to Clause 25, accepts jurisdiction, then the Carriage of Goods by Sea Act (COGSA) shall be compulsorily applicable to this contract of carriage if this Bill of Lading covers a shipment to or from the United States.  The provisions set forth in COGSA shall also govern before the Goods [are] loaded on or after they are discharged from the vessel provided, however, that the Goods at said time are in the actual custody of the Carrier or any Servant or Agent.  The Carrier's maximum liability in respect to the Goods shall not exceed USD 500 per package or, where the Goods are not shipped in packages, USD 500 per customary freight unit unless the nature and value of the Goods has been declared by the Merchant and inserted in writing, on the face of the Bill of Lading and said Merchant shall have paid the applicable ad valorem freight rate set forth in Carrier's Tariff.[47]

Here, because the suit without objection of any party was "brought in a court in the United States of America" and this Court has

---

[47] Rickmers GmbH Bill of Lading Clause 7.

jurisdiction, the liability limitation in Clause 7(2) would appear to apply in this dispute.

However, the Rickmers GmbH Bill of Lading also contains another Paramount Clause that involves contrary law. Clause 15 discusses carriage of goods on deck.

### 15. Optional Stowage and Deck Cargo

(1) The Goods may be packed by the Carrier in Containers and consolidated with other goods in Containers.

(2) Goods, whether or not packed in Containers, may be carried on deck or under deck without notice to the Merchant. All such Goods whether carried on deck or under deck, shall participate in general average and shall be deemed to be within the definition of goods for the purpose of the Hague Rules and *shall be carried subject to these Rules.*[48]

Clause 7(2) and Clause 15(2) appear to be in tension. Clause 7(2) requires the liability limitation of $500 per package or customary freight unit because the suit for damage to the Goods was brought in a United States Court. Clause 15(2), on the other hand, states that Goods carried on or below deck "shall be carried subject to" the Hague Rules.

Rickmers GmbH plausibly asserts that Clause 15(2) governs this dispute because it is the specific contractual provision that applies to on-deck stowage. *See* Columbia Mach., Inc. v. DFDS Transp. (US), Inc., No. 06-1140, 2007 WL 5173280, at *7 (C.D. Cal.

---

[48] Rickmers GmbH Bill of Lading Clause 15 (emphasis added).

27

Oct. 4, 2007) (interpreting bill of lading with similar choice-of-law provisions to signify an intent "to exclude on-deck carriage from [the clause incorporating COGSA] *and* to include [the on-deck clause applying the Hague Rules] to cover any and all on-deck carriage" (emphasis in original)).   If the analysis of <u>Columbia Machine</u> is followed, as Rickmers GmbH urges,[49] Clause 7(2) of the bill of lading, which incorporates COGSA, would therefore apply only to cargo carried *below* deck when suit is "brought in a court in the United States of America," and, correspondingly, pursuant to Clause 15(2), the Hague Rules would apply to cargo carried on deck.

(3)   <u>Fair Opportunity Doctrine</u>

The fair opportunity doctrine provides that "before a carrier can benefit from COGSA's limitation of liability or a contractual one, the cargo owner must be given a 'fair opportunity' to avoid the limitation." <u>Craddock Int'l Inc. v. W.K.P. Wilson & Son, Inc.</u>, 116 F.3d 1095, 1107 (5th Cir. 1997).[50]   The carrier bears the burden

---

[49] *See* Document No. 73 at 15-16; Document No. 88 at 7.

[50] Under Rickmers GmbH's interpretation, the Court is dealing with a "contractual" limitation of liability for on-deck carriage, because "without contractual extension, neither the Hague Rules, the Hague-Visby Rules, nor [COGSA] apply to disputes arising out of the carriage of on-deck cargo." Document No. 88 at 7 (citing 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 10-18 (4th ed. 2004)). Thus, Clause 15 "contractually extends the Hague Rules to govern the on-deck carriage of the riser joints . . . ." <u>Id.</u>

28

to produce *prima facie* evidence of a fair opportunity to declare a higher value. Couthino, Caro and Co., Inc. v. M/V Sava, 849 F.2d 166, 171 (5th Cir. 1988). Only if this burden is met will the burden shift to the shipper to produce evidence that no opportunity actually existed. Id.

The Fifth Circuit tends to look "for evidence that the carrier offered the shipper a choice of rates and valuations." M/V Sava, 849 F.2d at 171 (discussing Wuerttembergische and Badische Versicherungs-Aktiengesellschaft v. M/V Stuttgart Express, 711 F.2d 621 (5th Cir. 1983); Brown & Root, Inc. v. M/V Peisander, 648 F.2d 415 (5th Cir. 1981)). However, it "has not delineated exactly what type of evidence a carrier must set forth to satisfy a *prima facie* case of fair opportunity." Steel Coils, Inc. v. M/V Lake Marion, No. 98-3116, 2000 WL 777916, at *2 (E.D. La. June 15, 2000) (Vance, J.). In M/V Peisander, the shipper had a fair opportunity to avoid COGSA's limitation even when the bill of lading stated that liability shall "in no case exceed the amount of $500 per unit package" because the bill of lading incorporated COGSA, "and more significantly, the published tariff which has the effect of law very carefully gave Shipper a choice of valuations by a choice of precisely definable freight rates." 648 F.2d at 424. In M/V Stuttgart Express, the shipper had a fair opportunity to avoid COGSA's limitations when the bill of lading did not incorporate COGSA but did incorporate the tariff, which (1) "specifically

'offers shippers a choice of freight rates dependent upon whether the shipment is made subject to [the] Bill of Lading limit of value, or at a higher limit of value'"; and (2) "then states the rates and goes ahead to state a specific rate in case of a higher declared value." 711 F.2d at 622.

The Fifth Circuit most recently addressed the fair opportunity doctrine in <u>Tradearbed Inc. v. Western Bulk Carriers K/S</u>, affirming the district court's fact-finding that the shipper did not receive a fair opportunity to opt for a higher limitation from the mere incorporation of COGSA into the contract. No. 08-31075, 2010 WL 291778, at *9 (5th Cir. Jan. 26, 2010).

> Contrary to [the carrier]'s position, to invoke the package limitation, it is necessary to provide further evidence beyond incorporation of COGSA into the contract of carriage, such as the carrier's giving the shipper a choice of rates and valuations.

<u>Id.</u>

Rickmers GmbH asserts that its published tariff provided Marinor with the opportunity to opt for a higher liability limit for on-deck cargo. However, if as Rickmers GmbH contends, COGSA in this bill of lading applies only to below-deck cargo and the Hague Rules apply to above-deck cargo, then it appears that "a choice of rates and valuations" is provided only for below-deck cargo because variable rates are offered only in the context of COGSA, both in the bill of lading and in Rickmers GmbH's tariff. Thus, Clause

7(3), which immediately follows the adoption of COGSA liability
limits in Clause 7(2), provides that Shippers may increase the
liability limit by paying extra according to the ad valorem rate
outlined in the Carrier's tariff, which is incorporated in Clause 2
of the bill of lading.[51]

### (3) Shipper's declared value

> The Merchant agrees and acknowledges that the Carrier has
> no knowledge of the value of the Goods, and that higher
> compensation that tllat [sic] provided herein may tnot
> [sic] be claimed unless the nature and value of such
> Goods have been declared by the Merchant before shipment
> and agreed to by the Carrier and inserted in this Bill of
> Lading and the applicable ad valorem freight rate, as set
> out in Carrier's Tariff, is paid. . . .[52]

Rule 12 of Rickmers GmbH's Tariff provides how the ad valorem rate
is calculated.  Notably, it provides for an adjustment only for
COGSA's $500 liability limitation, and is silent as to any possible

---

[51] **2. Carrier's Tariff**

> The terms and conditions of the Carrier's applicable
> Tariff are incorporated herein. . . . Copies of the
> releant [sic] provisions of the applicable Tariff are
> obtainable from the Carrier or his agents upon request.
> In the case of inconsistency between this Bill of Lading
> and the applicable Tariff, this Bill of Lading shall
> prevail except that the applicable Tariff shall govern as
> to the Freight.

Rickmers GmbH Bill of Lading Clause 2.

[52] Rickmers GmbH Bill of Lading Clause 7(3).

adjustment for the Hague Rules' £100 limitation.   The Tariff provides:

AD VALOREM RATES

A.   The liability of the carrier as to the value of the shipment at the rates herein provided shall be determined in accordance with the clauses of the carrier's regular Bill of Lading form.

B.   If the shipper desires to be covered for a valuation in excess of that allowed by the carrier's regular Bill of Lading form, the shipper must so stipulate in carrier's Bill of Lading covering such shipments and such additional liability only will be assumed by the carrier at the request of the shipper and upon payment of an additional charge based on the total declared valuation in addition to the stipulated rates applying on the commodities shipped as specified herein.

C.   Where value is declared on any piece or package in excess of the Bill of Lading limit of value of $500.00, the Ad Valorem rate, specifically provided against the item, shall be three and three quarters per cent (3-3/4%) of the value declared in excess of the said Bill of Lading Limit of Value and is in addition to the base rate.[53]

Subsection A of the Ad Valorem Rates section of Rickmers GmbH's Tariff provides that liability limits shall be determined in accordance with the clauses in the bill of lading.   Subsection B provides that increased limits "only will be assumed by the carrier . . . upon payment of an additional charge . . . as specified herein."   Subsection C provides how the additional charge

---

[53] Document No. 88, ex. 1-A (Tariff) (found at Page 3 of 28 in Document No. 88-2).

32

is calculated. However, subsection C specifies how to increase the liability limit only for the COGSA prescribed liability limit-- which, according to Rickmers GmbH, applies only to *below-deck* cargo. Rickmers GmbH has pointed to no corresponding provisions in its bill of lading or tariff that describe and provide a fair opportunity to increase the Hague Rules liability limit that Rickmers GmbH contends applies to on-deck cargo.

The Fifth Circuit cases relied upon by Rickmers GmbH--M/V Peisander and M/V Stuttgart Express--do not involve situations where the carrier's bill of lading incorporates different liability limits for below-deck and on-deck carriage, as Rickmers GmbH states is the case here. *See* M/V Peisander 648 F.2d at 424; M/V Stuttgart Express, 711 F.2d at 622. In those cases, only one regime of limitation of liability was at issue. Thus, the tariffs in M/V Peisander and M/V Stuttgart Express resolved any doubt regarding the shipper's ability to raise the limit where only one limit of liability potentially applied to the cargo, not where, as here (according to Rickmers GmbH), different limits apply depending upon whether the cargo is carried on deck or below deck.

Ultimately, Rickmers GmbH bears the burden of presenting *prima facie* evidence that Marinor had a fair opportunity to increase whatever liability limitation applied. At this stage, relying on

33

its bill of lading and tariff alone, Rickmers GmbH has failed to show that it is entitled as a matter of law to summary judgment.[54]

B.   <u>Whether Rickmers GmbH was the Disclosed Principal of Rickmers America</u>

Rickmers America asserts that Marinor's contractual claims against it must be dismissed because they arise solely from Rickmers America's actions in its capacity as agent for Rickmers GmbH, a fully disclosed principal.  Marinor responds that Rickmers America is liable because Rickmers GmbH was not disclosed as Rickmers America's principal.  According to Marinor, "the booking notes fail to identify the principal on whose behalf Rickmers America was purportedly acting."

Marinor's argument lacks merit.  First, the Booking Note clearly discloses Rickmers GmbH as the carrier, that is, the

_____

[54] Marinor argues that, even if Rickmers GmbH does ultimately show its contractual entitlement to a limitation of liability, the vessel's intended geographic deviation would void any such limitation.  However, Marinor fails to cite a single case supporting the proposition that an *intended* geographic deviation that never actually occurs constitutes a deviation, and the Court has not found any cases supporting Marinor's argument.  The cases on which Marinor relies involve deviations that occur *before the loss of cargo*.  *See, e.g.*, <u>World Wide Steam Ship Co. v. India Supply Mission</u>, 316 F.Supp. 190, 192 (S.D.N.Y. 1970) ("Had the [vessel] not deviated to Piraeus, thereby delaying its arrival at the Suez Canal by some three days, the vessel would not have become fogbound and stranded, at least not when, where and how it did.").  Accordingly, Marinor's intended geographic deviation argument fails as a matter of law.

principal on the contract.  The Booking Note itself is entitled or captioned as being that of "Rickmers-Linie GmbH Cie KG."  The Booking Note contract is divided into boxes.  The first box provides: "1. Agents Rickmers-Linie (America) Inc.," with an address in Houston, Texas.  The box below it provides: "3. Carrier RICKMERS-LINIE GMBH & CIE KG," with an address in Hamburg, Germany.[55]

The Booking Note provides at the bottom of the page a signature block for "Signature (Carrier)" and below the signature line the agent's name is repeated, "Rickmer's Linie (America) Inc." This is the sole place for the "Carrier" to sign; there is no separately designated place for the carrier's agent to sign as "agent."  Marinor reasons that Bertha Marin's signature (presumably the employee of Rickmers-Linie (America)), on the carrier's signature line, means that Rickmers America was acting as the "Carrier" rather than as the agent for the true Carrier, as those parties are specifically identified in boxes 1 and 3.

Marinor's argument is specious.  The first two boxes of the Booking Note unambiguously define Rickmers America as the agent for Rickmers GmbH, and Rickmers GmbH as the Carrier.  That Rickmers America signed the signature block plainly shows that it was acting on behalf of its principal.

---

[55] Document No. 73, ex. 10-B at 2.

Moreover, the Rickmers GmbH Bill of Lading attached to the Rickmers GmbH Booking Note provides that Rickmers GmbH is the "Carrier" and was obligated to transport Marinor's risers. The bill also states: "RICKMERS LINIE (AMERICA) AS AGENT FOR THE CARRIER." Rickmers GmbH was thus the plainly disclosed principal for which its agent Rickmers America acted. Because it is undisputed that Rickmers America took no action outside of what it did as an agent for Rickmers GmbH, Marinor's claims against Rickmers America are dismissed.

V.   <u>Order</u>

Accordingly, it is

ORDERED that Defendant Primera Maritime (Hellas) Ltd.'s Motion for Partial Summary Judgment (Document Nos. 62-66) is GRANTED in part, and it is ADJUDGED that Primera is a "Carrier" as that term is defined in the Slade Bill of Lading, and is therefore a beneficiary of its limitation of liability terms; and the motion is otherwise DENIED.  It is further

ORDERED that Defendant Rickmers-Linie GmbH & Cie KG's Motion for Partial Summary Judgment (Document No. 73) is DENIED.  It is further

ORDERED that Defendant Rickmers-Linie (America), Inc.'s Motion for Summary Judgment (Document No. 73) is GRANTED, Plaintiff Marinor Associates, Inc. shall take nothing against Rickmers-Linie

36

(America), Inc., and Rickmers-Linie (America) is DISMISSED from this suit.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this 18TH day of February, 2011.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

37